# United States Court of Appeals
## For the First Circuit

No. 10-1309

JULIA V. VANCHURINA AND SVETOMIR RADISAVLEVIC,

Petitioners,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Stanley H. Cooper was on brief for petitioners.
Melissa Neiman-Kelting, Senior Litigation Counsel, Office of
Immigration Litigation, Tony West, Assistant Attorney General,
Civil Division, Leslie McKay, Assistant Director, Office of
Immigration Litigation, and Anthony J. Messuri, Trial Attorney,
were on brief for respondent.

September 8, 2010

**LYNCH**, **Chief Judge**.  Julia Vanchurina, a native and citizen of Russia, and her husband Svetomir Radisavlevic, a native of Yugoslavia and citizen of Serbia, seek review of a final order of removal of the Board of Immigration Appeals ("BIA").  The BIA upheld an Immigration Judge's ("IJ") denial of Vanchurina's request for asylum, of which Radisavlevic would be a derivative beneficiary, and Vanchurina's request for withholding of removal. We deny their petition.

## I.

Vanchurina and Radisavlevic entered the United States on May 17, 2006, as non-immigrant visitors.  On October 30, 2006, prior to the expiration of their visas, Vanchurina filed an affirmative asylum application with the Department of Homeland Security on the basis of past persecution, with Radisavlevic listed as a derivative beneficiary.  An asylum officer found that Vanchurina failed to establish that she was a refugee and referred the case to an IJ.  On February 5, 2007, Vanchurina and Radisavlevic were served with a Notice to Appear charging each of them with removability, which they conceded.

On June 5, 2008, Vanchurina and Radisavlevic testified before an IJ at a hearing on Vanchurina's petition for asylum and withholding of removal.  As a spouse cannot be a derivative beneficiary of withholding of removal, and  Radisavlevic did not file an independent application, the only relief he requested was

asylum. Neither petitioner requested relief under the Convention Against Torture.

We briefly summarize their testimony, which the IJ found credible.

In 1998, Vanchurina started a small internet business in Moscow. The company was successful, with revenues of $10,000 per month, and governmental monitoring organizations--the Internal Revenue Service and Ministry of Communications--soon began to make weekly "inspections" of her business premises. She started to receive phone calls stating that she needed to pay a price to stop the inspections, but she refused to pay and told the police about the incidents. Although the police refused to take a report, they told her that if anyone threatened her life, they would intervene.

At approximately the same time, Radisavlevic was subjected to separate economic coercion. He was the head of a construction crew building a hotel in Russia, and when he sought payment of $20,000 for work that his crew had done, he was forced, at gunpoint, to sign a promissory note to instead pay this sum to the company. He went to the police but they refused to take a report, so Vanchurina and Radisavlevic paid the sum in $1,000 monthly installments, at one point under threat that their visiting grandson would be taken if they did not pay.

In November of 2000, Vanchurina's place of business was raided by the police, who seized her office equipment and called

her in for questioning. The police told her that they would plant narcotics and weapons in her office if she did not pay them $2,000 per month. When she refused, she was subjected to questioning every morning for five days in a row, which ended only when she threatened to have her son file suit against them in an international court. The phone calls then stopped, but only temporarily, and at the end of 2001, Vanchurina and Radisavlevic received a phone call threatening to kidnap their grandson.

In response to these threats, which Vanchurina characterized as "scary," she sold her internet business for $20,000--one fifth of the value that she estimates it was worth--and moved to the suburbs of Moscow, where she and Radisavlevic began construction on a house. Soon thereafter, local police commenced frequent inspections of the house, and Vanchurina was told that she needed to pay them $500 per month for protection from further inspections and coercion. After she refused to pay, a container of waste was set on fire close to their house on three occasions; each occasion was followed by a phone call asking whether she was frightened and whether she realized that she needed to pay for protection. During the winter of 2005, the electricity and gas service to their house was cut several times; Vanchurina attributed this to the extortion attempts, but did not provide evidence that the cuts were intentional.

Vanchurina and Radisavlevic did not attempt to avoid the threats by changing phone numbers or leaving the Moscow area. Vanchurina explained that the reason they refused to pay on the threats to their house was that she did not want to "play along" with the corrupt system--that doing so was against her conscience and Christian beliefs. In 2006, they moved to the United States to escape the threats and demands. Vanchurina believes that the threats and demands will resume if they return to Russia and that the only way to avoid them would be to "give everything away and be . . . poor."

In an oral decision dated June 5, 2008, the IJ found their testimony credible, but denied Vanchurina's petition for asylum and withholding of removal, concluding that Vanchurina and Radisavlevic "were subjected to extortion and it was no doubt an unpleasant and frightening experience, but the experiences described . . . do not rise to the level of persecution." The IJ further held that even if this extortion constituted persecution, "the basis for the victimization . . . was economic and at no point does the evidence reveal that respondents were victimized on account of one of the five protected areas." See 8 U.S.C. § 1101(a)(42)(A). Finding Vanchurina ineligible for asylum, the IJ found that she could not meet the more stringent standard for withholding of removal.

The BIA affirmed the IJ's denial of Vanchurina's application for asylum and withholding of removal on the grounds that "the nature and context of the respondents' claim--one that entails criminal extortion and threats--does not implicate an enumerated protected ground." The BIA found that because the respondents did not qualify for asylum, they failed to meet the higher burden for withholding of removal.

## II.

No pure question of law is presented by this petition. We review the BIA's findings under the substantial evidence standard. Matovu v. Holder, 577 F.3d 383, 386 (1st Cir. 2009). "Under this deferential standard, we accept these findings so long as they are grounded in reasonable, substantial, and probative evidence on the record considered as a whole," id. (quoting Sharari v. Gonzáles, 407 F.3d 467, 473 (1st Cir. 2005)) (internal quotation marks omitted), and grant a petition only "if the record compels a conclusion contrary to that reached by the agency," Lopez Perez v. Holder, 587 F.3d 456, 460 (1st Cir. 2009).

An applicant for asylum must demonstrate past persecution, or a well-founded fear of future persecution, on grounds of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). A showing of past persecution gives rise to a rebuttable presumption of future persecution. Anacassus v. Holder, 602 F.3d

14, 19 (1st Cir. 2010). Otherwise, a petitioner must provide "specific proof" that his or her fear of future persecution "is both subjectively genuine and objectively reasonable." Decky v. Holder, 587 F.3d 104, 110 (1st Cir. 2009) (quoting Castillo-Diaz v. Holder, 562 F.3d 23, 26 (1st Cir. 2009)) (internal quotation marks omitted).

An alien's experiences "must add up to more than ordinary harassment, mistreatment, or suffering" to meet the requirement of "persecution." Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007). Persecution need not be physical, see Un v. Gonzales, 415 F.3d 205, 210 (1st Cir. 2005), but economic extortion does not rise to the level of economic persecution unless it involves the "deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment, or other essentials of life," Kadri v. Mukasey, 543 F.3d 16, 22 (1st Cir. 2008) (quoting In re T-Z, 24 I & N. Dec. 163, 171 (BIA 2007)) (internal quotation mark omitted).

Substantial evidence supports the BIA's finding that "the nature and context of the respondents' claim--one that entails criminal extortion and threats"--did not establish grounds for asylum. The fact that the police threatened to plant narcotics or weapons in Vanchurina's office if she did not pay them was a threat and did not itself cause a deprivation of liberty. Likewise, the weekly governmental "inspections" of Vanchurina's business and the

burning of trash near her house did not deprive her of housing or employment.  She did sell her business, Moscow apartment, and country house to escape from these threats, but she was not coerced to do so; in fact, this result was contrary to the wishes of those making the threats, who wanted money.  Of the numerous threats that Vanchurina and Radisavlevic received, they paid money in response to one--the 1998 threat to Radisavlevic at work--and failed to specify how these payments imposed a "severe economic disadvantage."  On the contrary, they testified to facts--such as their construction of a "large house" in a "nice neighborhood" in the Moscow suburbs--that could lead the BIA reasonably to conclude otherwise.

Substantial evidence also supports the finding that Vanchurina was not subjected to extortion on account of a protected ground.  Vanchurina contends that "small business owners" should be treated as  a "social group" under the Immigration and Nationality Act on the grounds that the group has particular and well-defined boundaries that would be generally recognized by others in the community.  However, in evaluating claims for asylum on grounds of membership in a social group, "the key is whether the claimed persecution is aimed at an individual because of his or her affiliation with a group of persons, all of whom share a common, immutable characteristic."  Silva v. Ashcroft, 394 F.3d 1, 5 (1st Cir. 2005).  The IJ and BIA were not compelled to conclude on these

facts that the individual economic extortion of Vanchurina was on protected grounds.  Cf. López-Castro v. Holder, 577 F.3d 49, 54 (1st Cir. 2009) ("A country-wide risk of victimization through economic terrorism is not the functional equivalent of a statutorily protected ground, and hostile treatment based on economic considerations is not persecution.").

Furthermore, even if "small business owners" were a "social group" within the meaning of the statute, Vanchurina would need to establish that she was persecuted "on account of" her membership in this group.  Vanchurina did not provide any evidence that she was being targeted because she was a small business owner, rather than merely because she had money.  Because the "facts invite the inference that whoever was threatening the petitioner targeted her because of greed, not because of her political opinion or membership in a particular social group," Lopez de Hincapie, 494 F.3d at 219, the BIA did nor err in finding that Vanchurina did not satisfy the statutory criteria.

The petition is denied.

So ordered.